IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

TRISTON JAMES RHODES                                    PLAINTIFF

v.                         Case No. 4:23-cv-04058

FULTON THERMAL CORP.                                    DEFENDANT

## MEMORANDUM OPINION

Before the Court is a Motion for Summary Judgment filed by Defendant Fulton Thermal Corp. ("Defendant"). (ECF No. 18). Plaintiff Triston James Rhodes ("Plaintiff") has responded. (ECF No. 33). Defendant replied. (ECF No. 38). The Court finds the matter ripe for consideration.

## I.  BACKGROUND

This is a personal injury action that arises from an incident that took place on July 9, 2020, at Tyson Poultry, Inc.'s ("Tyson") plant in Nashville, Arkansas. (ECF No. 18, at 1). Plaintiff and Jeremy Hamner ("Mr. Hamner") were inspecting a thermal fluid heater ("boiler"). (ECF No. 32, at 1). This boiler was manufactured and routinely inspected by Defendant. (ECF No. 18, at 1). While inspecting the boiler, a fire and explosion occurred that injured Plaintiff and Mr. Hamner. (ECF No. 19, at 1). Subsequently, Plaintiff filed the instant action bringing claims for strict products liability and negligence. (ECF No. 15, at 4-6).

Plaintiff worked at Tyson's plant as an automation technician. (ECF No. 20, at 10). On July 8, 2020, Plaintiff arrived at the plant at 4:30 p.m. to begin his night shift. (ECF No. 20, at 10). Near the end of Plaintiff's work shift at roughly 1:00 a.m. to 2:00 a.m., on July 9, 2020, he and Mr. Hamner went to a building containing three boilers manufactured by Defendant to conduct an inspection of the boilers. (ECF No. 20, at 10; ECF No. 20, at 2). Mr. Hamner started the inspection by performing safety checks on the second boiler. (ECF No. 20, at 10). He first checked

the boiler's low gas pressure switch by turning off the natural gas supply and shutting down the boiler. (ECF No. 34, at 4). Mr. Hamner then reopened the main gas valve and restarted the boiler. (ECF No. 20, at 10; ECF No. 34, at 4). Next, Mr. Hamner moved to test the high gas pressure switch. (ECF No. 20, at 11; ECF No. 34, at 4). However, before Mr. Hamner could do so, both he and Plaintiff witnessed a "cloud of white stuff" and heard a "mechanical sound" before the boiler exploded in front of Plaintiff and Mr. Hamner. (ECF No. 34, at 4).

The boilers in question were fired using natural gas and used to heat thermal fluid. (ECF No. 34, at 4). The thermal fluid was pumped throughout Tyson's plant to heat the grease used in Tyson's cooking process. (ECF No. 34, at 4; ECF No. 20, at 1). The thermal fluid used in the boilers was a flammable mineral oil called Paratherm NF ("Paratherm") that has a flashpoint of 300 °F.[1] (ECF No. 20, at 3; ECF No. 32-1, at 10). The boilers typically functioned with a setpoint of between 550 °F and 555 °F. (ECF No. 20, at 3; ECF No. 34, at 2). The boilers operated "by essentially creating a pressurized heated environment in which hot air makes multiple passes along internal coils containing Paratherm which heats the Paratherm to a desired temperature before being piped to Tyson's cooking lines."[2] (ECF No. 20, at 2; ECF No. 34, at 3; ECF No. 18-16, at 2). Two of the boilers—including the boiler in question—were installed in 1999 and the third was installed in 2011. (ECF No. 20, at 2). The three boilers were placed on top of a "skid." (ECF No. 20, at 3). In addition to Defendant's three boilers, the building also contained a large open-top expansion tank that was used to hold old Paratherm and several other pieces of equipment. (ECF No. 20, at 3).

---

[1]The Court notes that flashpoint is defined as "the minimum temperature at which a liquid gives off vapor within a test vessel in sufficient concentration to form an ignitable mixture with air near the surface of the liquid . . . ." 29 C.F.R. § 1910.106(a)(14). Simply put, it is the "lowest temperature of a liquid, as determined by specific laboratory tests, at which the liquid gives off vapors at a sufficient rate to support a momentary flame across its surface." (ECF No. 32-1, at 10).
[2]The Court also notes that there is a diagram of the boilers that contains a more detailed summary of how the boiler operates. (ECF No. 18-16, at 2).

Tyson performed hourly, daily, weekly, monthly, and quarterly inspections of the boilers via visual inspection.[3]  (ECF No. 20, at 4).  During the hourly, daily, and weekly inspections Tyson employees typically only record the pressures and temperatures reflected on the safety switches and look for smoke or leaks from the boiler.  (ECF No. 20, at 4: ECF No. 34, at 1).  Defendant's employees conducted inspections of the boilers on a quarterly and annual basis.  (ECF No. 20, at 7).  Defendant's quarterly inspections lasted one to two hours and were designed to examine the boiler while it was operating and verify that the safety features were working properly.  (ECF No. 20, at 7).  Part of the quarterly inspection included "checking the heater's pumping system, flex lines and piping, checking gauges to ensure the operating pressure is within acceptable ranges, verifying various information with the previous month's inspection report, checking the various safety components, and making sure there is no smoke coming from the smokestacks on top of the boiler."  (ECF No. 20, at 7).  Defendant's yearly inspections lasted two full days and involved taking the boilers offline to conduct a physical examination of the internal components of the boilers.  (ECF No. 20, at 7).  During the physical examination, Defendant's personnel would physically enter the boiler to visually inspect the interior coil.  (ECF No. 20, at 8).  Defendant's personnel would check the inside for indicators of potential Paratherm leakage in the internal pipe ("coil"), because a leaking coil could lead to unintended combustion within the combustion chamber of the boiler.[4]  (ECF No. 20, at 8).  Defendant's personnel preformed a quarterly inspection of the boilers on January 21, 2020, an annual inspection on April 18, 2020, through

---

[3]The Court notes that Plaintiff has failed to cite to the record in his Statement of Material Facts section (ECF No. 34, at 1) that contains disputes with Defendant's Statement of Undisputed Material Facts.  *See* Fed. R. Civ. Pro. 56(c). Plaintiff also states that "Defendant's Statement of Undisputed Material Facts is generally accurate but incomplete." (ECF No. 34, at 1).

[4]The Court notes that there is two coils inside the boiler, the inner ring and outer ring.  (ECF No. 18-16, at 2).

April 19, 2020, and another quarterly inspection on July 9, 2020.  (ECF No. 20, at 9).  No issues of concern were identified during the inspections.  (ECF No. 20, at 9).

On April 11, 2023, Plaintiff filed the instant lawsuit alleging claims of strict product liability and negligence against Defendant in the Circuit Court of Howard County, Arkansas.  (ECF No. 3; ECF No. 15, at 4-6).  On June 2, 2023, Defendant filed a Notice of Removal to the Western District of Arkansas on the basis of diversity jurisdiction.  (ECF No. 2).

On April 19, 2024, Defendant filed the instant Motion for Summary Judgment.  (ECF No. 18).  Defendant argues that Plaintiff has failed to identify any evidence of a design or manufacturing defect and asserts that Plaintiff's own expert witness has been unable to identify any such defect.  (ECF No. 18, at 1).  Defendant contends that it is entitled to summary judgment on the negligence claim because there is no evidence that it was negligent in inspecting the boilers.  (ECF No. 18, at 1-2).  Further, Defendant argues that Plaintiff has failed to present evidence showing that Defendant breached a duty of care owed to him or that Defendant was the proximate cause of Plaintiff's injuries.  (ECF No. 18, at 2).  Defendant then argues that it is entitled to summary judgment on any alleged failure to instruct theory because Plaintiff's expert did not opine that there was any defect in Defendant's instructions.  (ECF No. 18, at 2).

## II.   STANDARD OF REVIEW

The standard for summary judgment is well established.  When a party moves for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Krenik v. Cnty. of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995).  This is a "threshold inquiry of . . . whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they reasonably may be

resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material only when its resolution affects the outcome of the case. *Id*. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id*. at 252.

In deciding a motion for summary judgment, the Court must consider all the evidence and all reasonable inferences that arise from the evidence in a light most favorable to the nonmoving party. *Nitsche v. CEO of Osage Valley Elec. Co-Op*, 446 F.3d 841, 845 (8th Cir. 2006). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik*, 47 F.3d at 957. However, a party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 256. "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving part's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 526-27 (8th Cir. 2007).

### III.  DISCUSSION

The Court faces two issues in the instant motion: (1) whether there is a genuine issue of material fact as to Plaintiff's strict products liability claim and (2) whether there is a genuine issue of material fact as to Plaintiff's negligence claim. The Court will review each in turn.

#### A.  Strict Products Liability

Arkansas broadly defines "product liability action" as including "all actions brought for or on account of personal injury, death, or property damage caused by or resulting from the

5

manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging, or labeling of any product." Ark. Code Ann. § 16-116-202(5). Thus, a plaintiff can assert multiple theories of liability in a product liability claim. *See Nationwide Rentals Co., Inc. v. Carter*, 298 Ark. 97, 101, 765 S.W.2d 931, 933 (1989).

In 1973, Arkansas adopted the strict liability theory of recovery for products liability cases. *Forrest City Mach. Works, Inc. v. Aderhold*, 273 Ark. 33, 39, 616 S.W.2d 720, 724 (1981). To recover under that theory, a plaintiff must prove: (1) that the defendant was engaged in the business of manufacturing, assembling, selling, or leasing, or otherwise distributing the product; (2) that the product supplied by the defendant was in a defective condition that rendered it unreasonably dangerous; (3) that the plaintiff sustained damages; and (4) that the defective condition was a proximate cause of the plaintiff's damages. *See S. Co. v. Graham*, 271 Ark. 223, 225, 607 S.W.2d 677, 679 (1980) Ark. Model Jury Instr., Civil AMI 1008. Proof that a product was "unreasonably dangerous" requires "something beyond that contemplated by the ordinary and reasonable buyer, taking into account any special knowledge of the buyer concerning the characteristics, propensities, risks, dangers, and proper and improper uses of the product." *Pilcher v. Suttle Equip. Co.*, 365 Ark. 1, 7, 223 S.W.3d 789, 794 (2006). A "defective condition" renders a product unsafe for reasonably foreseeable use and consumption. Ark. Code Ann. § 16-116-202(2). "Strict liability eliminates the need to show both privity and negligence. But a plaintiff still must prove injury and that it was caused by the product." *Mixon v. Chrysler Corp.*, 281 Ark. 202, 205, 663 S.W.2d 713, 714 (1984). To do so, there must be proof the product was defective when it left the seller's hands. *See Higgins v. Gen. Motors Corp.*, 250 Ark. 551, 555, 465 S.W.2d 898, 900 (1971). Generally, "there are three varieties of product defects: manufacturing defects, design defects, and

inadequate warnings." *West v. Searle & Co.*, 305 Ark. 33, 37, 806 S.W.2d 608, 610 (1991). The parties only address manufacturing defects and design defects in the instant motion.

"Manufacturing defects involve a configuration of a product that deviates from the intended design." *Simpson v. Wright Med. Grp., Inc.*, No. 5:17-cv-0062-KGB, 2018 WL 1570795, at *9 (E.D. Ark. Mar. 30, 2018). To prevail on a manufacturing defect claim, the plaintiff must show that a defect in the product's design was the proximate cause of injuries, and that the product was in a defective condition when it left the defendant's hands. *See Higgins*, 250 Ark. at 555, 465 S.W.2d at 900. A design defect claim involves "a design that is executed according to plan but produces unintended and unwanted results." *Simpson v. Wright Med. Grp., Inc.*, No. 5:17-cv-0062-KGB, 2018 WL 1570795, at *9 (E.D. Ark. Mar. 30, 2018). To prevail on a design defect claim, the plaintiff must also show that a defect in the product's design was the proximate cause of injuries, and that the product was in a defective condition when it left the defendant's hands. *See Higgins*, 250 Ark. at 555, 465 S.W.2d at 900.

Absent direct proof of a manufacturing or design defect, it is sufficient if the plaintiff offers substantial evidence that "negates other possible causes of failure of the product not attributable to the defendant, thus raising a reasonable inference that a defective condition existed while the product was still in the defendant's control." *Madden v. Mercedes-Benz USA, Inc.*, 2016 Ark. App. 45, at 6, 481 S.W.3d 455, 450 (2016). "Substantial evidence is that which is of sufficient force and character that it will compel a conclusion one way or another. It must force or induce the mind to pass beyond suspicion and conjecture." *Id*. (citing *Higgins v. Gen. Motors Corp.*, 287 Ark. 390, 392, 699 S.W.2d 741, 743 (1985)). Further, "such proof may be [shown] by circumstantial evidence." *B. Braun Med., Inc. v. Sexton*, 2025 Ark. App. 55, at 17 (2025). "'[W]hen common experience teaches that an accident would not have happened in the absence of

a defect, a case may sometimes be allowed to proceed to a factfinder' provided that the plaintiff can produce evidence that tends to negate other causes of the observed failure." *Am. Nat'l Prop. & Cas. Co. v. Broan-Nutone, LLC*, No. 5:18-CV-5250, 2020 WL 3578024, at *2 (W.D. Ark. July 1, 2020) (quoting *Crawford v. Sears Roebuck & Co.*, 295 F.3d 884, 886 (8th Cir. 2002)).

Defendant contends that Plaintiff has failed to present evidence that a manufacturing or design defect was present in the boiler that caused the fire. (ECF No. 19, at 12). Defendant points out that Plaintiff's own expert testified that he was "not saying there's a manufacturing defect, though," and when asked if there was a design defect with the boiler, Plaintiff's expert answered "[n]o." (ECF No. 19, at 13; ECF No. 18-4, at 13). Defendant argues that both it and Tyson routinely conduct inspections of the external aspects of the boilers and conduct yearly internal inspections of the boiler. (ECF No. 19, at 13). Defendant notes that none of the inspections identified any relevant issues with the boilers. (ECF No. 19, at 13). Defendant highlights that none of Tyson's or Defendant's employees believed that the boilers suffered from defects. (ECF No. 19, at 13). Defendant also argues that the cause and origin of the fire is unknown. (ECF No. 19, at 13).

Plaintiff contends that collected testimony provides enough evidence from which a reasonable jury could find strict liability in his favor on these facts. (ECF No. 33, at 8). Plaintiff reiterates his theory that Paratherm vapor leaked into the combustion chamber of Defendant's boiler causing the explosion. (ECF No. 33, at 8-9). Further, Plaintiff argues that his expert has ruled out the only other potential causes for the explosion leaving his theory as the only reasonable one. (ECF No. 33, at 9). Plaintiff points out that Defendant's expert was unable to determine a cause of the explosion. (ECF No. 33, at 9).

In reply, Defendant argues that Plaintiff has not presented any evidence that a defect was present in the boiler. (ECF No. 38, at 1). Defendant again points out that Plaintiff's expert has expressly testified that he was "not saying there's a manufacturing defect" or that there was a design defect with the boiler. (ECF No. 38, at 1). Defendant also argues that Plaintiff has implicitly acknowledged there is no direct evidence of any defects. (ECF No. 38, at 2). Defendant asserts that Plaintiff's expert has failed to rule out the other possible causes of the fire with substantial evidence. (ECF No. 38, at 3). Defendant then opines that the complexities of the boiler establish that it is outside the common experience of a lay jury. (ECF No. 38, at 4).

As an initial note, Plaintiff presents no direct proof that a specific defect exists. Instead, Plaintiff almost solely relies on witness testimony and his expert witness David Caggiano ("Mr. Caggiano") to present circumstantial evidence in his favor. Plaintiff is correct that circumstantial evidence can potentially be used. However, the Court is unpersuaded that Plaintiff's presented circumstantial evidence rises to the level of being substantial evidence that would force or induce the mind beyond suspicion or conjecture. Mr. Caggiano provides a theory for what he believes occurred—that a coil in the boiler failed, releasing vapor into the combustion chamber that ignited—but he has repeatedly stated that he is unsure what could have caused a perforation in the coil. Further, when asked during his deposition if he believed there was a manufacturing defect with Defendant's boilers he responded, "I'm not saying there's a manufacturing defect, though." (ECF No. 18-4, at 14). When asked if he was saying there was a design defect with Defendant's boiler, he responded, "[no]." (ECF No. 18-4, at 14). Mr. Caggiano has also admitted that there could be other ignition points spread out through the room other than the boiler. (ECF No. 18-4, at 22). Thus, the Court is left unsure how there can be substantial evidence of a defect that would force or induce the mind to pass beyond suspicion and conjecture when Plaintiff's own expert

witness cannot state that there was a manufacturing or design defect in the boiler, and that other ignition points were available in the boiler room.

Plaintiff points to the deposition of Justin Harrington ("Mr. Harrington")—a service technician employed with Defendant—to show that coil failures "have plagued [Defendant's boilers] for years."  However, review of Mr. Harrington's deposition shows that during his eighteen (18) years working for Defendant, Mr. Harrington only witnessed one coil that popped and had only heard of other coils popping but none at Tyson's facility.  (ECF No. 32-8, at 12).  The popped coil that was witnessed occurred early in the boiler's life cycle and was caused by improper balancing of the system which led to poor flow in the system.  (ECF No. 32-8, at 12-13).  Plaintiff also points to testimony from Waylon Roberson ("Mr. Roberson"), a lead maintenance man for Tyson who testified about the boilers and the protocols for dealing with the boilers to support Mr. Caggiano's theory.  However, in relevant part, it would appear Mr. Roberson was only talking about what would occur if there was natural gas left in the system and did not answer on what would occur if Paratherm vapor was introduced to the system.  (ECF No. 32-7, at 38).  Viewing the evidence in the light most favorable to Plaintiff, the Court still must find that Plaintiff has failed to offer substantial evidence that compels a conclusion one way or another and induces the mind to pass beyond suspicion and conjecture.

Additionally, the Court is unconvinced that common experience would inform a lay jury that the boiler would not have exploded absent a defect.  The complex inner mechanics of the boilers, the reaction of Paratherm and other materials under extreme heat, and the use of flashpoint and setpoint are all outside the realm of a juror's everyday experience.  Thus, common experience does not dictate that if something causes a boiler to catch on fire and explode that it was because of a defect in Defendant's boiler.  Accordingly, upon review of the record, the Court finds that

Plaintiff has failed to present substantial evidence of a manufacturing or design defect and, thus, summary judgment is appropriate on Plaintiff's strict product liability claim.

### B. Negligence

Plaintiff's negligence claim appears to be based on a theory that Defendant was negligent in inspecting and servicing the boiler. Plaintiff provides that Defendant has a duty to use ordinary care in the design, selection of materials, assembly, inspection and testing to protect those who will use the product. Defendant does not contest this argument. Instead, both parties center their arguments on whether Defendant breached a duty to Plaintiff that proximately caused the incident.

Negligence "is the failure to do something that a reasonably careful person would do, or the doing of something that a reasonably careful person would not do." *Schubert v. Target Stores, Inc.*, 2010 Ark. 466, 4, 369 S.W.3d 717, 719 (2010). The essential elements of a negligence claim are: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; and (3) the breach was the proximate cause of the plaintiff's injuries. *See Branscumb v. Freeman*, 360 Ark. 171, 179, 200 S.W.3d 411, 416 (2004). The burden is always on the plaintiff; negligence is never assumed. *See Yanmar Co. v. Slater*, 2012 Ark. 36, 16, 386 S.W.3d 439, 449 (2012).

Negligence may be established by direct or circumstantial evidence, but a plaintiff may not rely on inferences based on conjecture or speculation. *See Ark. Kraft, a Div. of Green Bay Pkg. v. Cottrell*, 313 Ark. 465, 471, 855 S.W.2d 333, 337 (1993). Sufficient evidence is not present if a factfinder is merely given a choice of possibilities that requires the factfinder to guess as to a cause. *Id*. "The mere fact of an accident does not give rise to an inference of negligence." *Yanmar Co.*, 2012 Ark. at 16, 386 S.W.3d at 449.

"Proximate cause means a cause which, in a natural and continuance sequence, produces damage and without which the damage would not have occurred." *White River Rural Water Dist.*

11

*v. Moon*, 310 Ark. 624, 627, 839 S.W.2d 211, 212 (1992). "This traditional tort standard requires proof that "but for" the tortfeasor's negligence, the plaintiff's injury or death would not have occurred." *Gonzales v. Cont'l Cas. Co.*, 2022 Ark. App. 501, at 6-7, 659 S.W.3d 277, 282 (2022) (citation omitted). Although proximate cause is usually a fact issue to be decided by a jury, it becomes a question of law for the Court when reasonable minds could not differ. *See Wilson v. Evans*, 284 Ark. 101, 102, 679 S.W.2d 205, 206 (1984).

Defendant states that both it and Tyson routinely inspected the boilers to ensure they were operating properly, and did not find any issues that could have resulted in a fire. (ECF No. 19, at 17). Defendant argues that Mr. Caggiano's theory is that the fire was caused by an unknown perforation in the coil containing Paratherm that "would have occurred pretty soon before the fire." (ECF No. 19, at 18). Defendant contends that while it has been alleged, no evidence of a perforation has ever been reported or noticed during the many inspections performed. (ECF No. 19, at 18). Defendant argues that if a leak did exist within the coil, it would have produced physical evidence such as smoke coming out of the exhaust stack or evidence of staining inside the chamber. (ECF No. 19, at 18). Defendant emphasizes that even assuming *arguendo* that Mr. Caggiano was correct, the fire occurred two days after Defendant's inspection and there would have been nothing to alert Defendant to a potential problem because it did not exist at the time of the inspection. (ECF No. 19, at 19). Additionally, Defendant highlights that Mr. Caggiano has speculated on several different potentials causes that could have caused a perforation in the coil. (ECF No. 19, at 19).

Plaintiff argues that the white cloud Plaintiff and Mr. Hamner noticed right before the explosion was consistent with a coil rupture leaking Paratherm. (ECF No. 33, at 6). Plaintiff also argues that ruptured coils have occurred before and that Mr. Harrington's testimony supports this

12

theory.  (ECF No. 33, at 7).  Plaintiff further notes that Defendant should have been conducting non-destructive testing or advanced scans of the coil to ensure it was still properly functioning after twenty-one years of use.  (ECF No. 33, at 7).  Plaintiff argues that years of constant use and "coke" build up could have contributed to the explosion.[5]  (ECF No. 33, at 7).  Plaintiff contends that Defendant's inspection of the coil by flashlight would only expose one quarter of the surface area of the coil because the rest would be hidden behind the inner ring of the coil.  (ECF No. 33, at 7).

In reply, Defendant re-emphasizes that the events that Mr. Caggiano alleges may have caused the fire would not have been revealed during Defendant or Tyson's prior inspections of the boiler.  (ECF No. 38, at 4).  Defendant notes that when looking at materials for the effective life span of boilers, Mr. Caggiano looked at hot water boilers and steam boilers but not boilers containing Paratherm.  (ECF No. 38, at 5).  Defendant points out that Mr. Caggiano admitted during his testimony that a potential perforation in the coil could have been caused by several different variables other than coke build up in the coil.  (ECF No. 38, at 5).  Defendant also argues that per Mr. Harrington's testimony, if there was a popped coil there would be evidence of internal staining or smoke emitting from the smokestack of the boiler.  (ECF No. 38, at 7).

Even viewing the evidence in the light most favorable to Plaintiff, the Court fails to see how Defendant's actions could be the proximate cause of the incident.  As Defendant points out, it is undisputed that both Defendant and Tyson routinely inspect the boilers, and these inspections have not identified issues with the boilers that could lead to this incident.  While Plaintiff opines that a build up of coke in the coil may have caused a perforation, Tyson, not Defendant was

---

[5]The Court notes that "coke" appears to be a type of carbon build up caused by oxidation that can gradually accumulate in a coil.  (ECF No. 32-1, at 11).

responsible for monitoring the Paratherm fluid in the system that would reveal a coke buildup.[6] Further, Plaintiff's expert notes that any perforation that may have occurred would have appeared only a few hours before the incident. From Mr. Harrington's testimony, any type of internal leak would have produced a black or white smoke out the smokestack of the boiler and this was not present during any of the inspections conducted by Defendant. (ECF No. 32-8, at 13, 16). The Court fails to see how Defendant's alleged failure to inspect could be the proximate cause when its inspection would not be able to reveal a perforation that was not physically present at the time. Thus, the Court finds that reasonable minds could not differ, and that Plaintiff has failed to present a genuine dispute of material fact. Accordingly, the Court finds that Defendant is entitled to summary judgment as a matter of law as to Plaintiff's negligence claim.

### IV.  CONCLUSION

For the above-stated reasons, the Court finds that Defendant's Motion for Summary Judgment (ECF No. 18) should be and hereby is **GRANTED**. This case is **DISMISSED WITH PREJUDICE**. A judgment of even date shall issue.

**IT IS SO ORDERED**, this 28th day of March, 2025.

/s/ Susan O. Hickey
Susan O. Hickey
Chief United States District Judge

---

[6]The Court notes that the latest Paratherm report—dated seven (7) months before the incident—showed that while there was some fluid degradation, there was no immediate cause for concern unless operating issues occurred and that sampling was recommended in one (1) year. (ECF No. 32-1, at 11).